Robert A. **RODRIGUEZ**, Appellant,

v.

Dr. Robert C. **SEAMANS**, Jr., Secretary
of the Air Force, et al.

No. 24599.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 1, 1971.

Decided April 3, 1972.

Mr. Edward L. Merrigan, Washington,
D. C., for appellant.

Mr. Richard S. Stolker, Atty., Dept. of
Justice, with whom Mr. Robert L. Keuch,
Atty., Dept. of Justice, was on the brief,
for appellees.

Before WRIGHT and TAMM, Circuit
Judges, and FRANK M. JOHNSON,
Jr.,* Chief Judge, U. S. District Court
for the Middle District of Alabama.

TAMM, Circuit Judge:

 In this appeal we are asked to de-
termine whether the Government has
the power to discharge a Veterans' Pref-
erence Act employee who gave false an-
swers to certain questions on federal
employment forms with reference to
membership in either the Communist
Party or other Communist-affiliated or-
ganizations. We have had a great deal
of litigation involving both freedom of
association and loyalty oaths in recent
years. Of course, we note that there is
a significant difference in those cases
and the instant case, as this is a suit
brought by a party who, as a result of
his falsification of forms and not as a
result of his prior memberships and as-
sociations, lost his position with the Air
Force. Appellant's discharge took place
after 27 years of otherwise exemplary
service; he now seeks re-instatement to
his former position. As the facts will
indicate, the circumstances involving Mr.
Rodriguez' dismissal are indeed unfortu-
nate and may be indicative of a degree
of governmental overkill. However, in
reviewing the record it is apparent that
the action of the Air Force and the Civil
Service Commission is neither arbitrary
nor capricious, nor can it be said to have
been unreasonable. That being the case,

* Sitting by designation pursuant to 28 U.S.C. § 292(c) (1970).

we affirm the trial judge's grant of the Government's motion for summary judgment.

## I.

Mr. Rodriguez filed an application on October 21, 1963, for a position as a general engineer with the United States Air Force. The position required a security clearance, for which he applied at the same time. One of the questions asked on the forms completed, *viz.*, Standard Form 57 (Application for Federal Employment), Air Force Form 1150 (Security Certificate for Civilian Employment), and Department of Defense Form 398 (Statement of Personal History), required an answer to questions regarding membership in the Communist Party or other Communist organizations and in organizations contained on Civil Service Form 385, organizations designated by the Attorney General pursuant to Executive Order 10450. On each form Rodriguez answered these affiliation inquiries falsely, denying affiliation in any of the proscribed groups. This was contradicted by the appellant himself in a voluntary statement, made under oath, to an Air Force investigator, who on April 16, 1964, was conducting an investigation regarding the position for which appellant had applied. In the course of the statement given to the investigator, Rodriguez admitted that, in fact, he belonged to the Young Communist League from approximately 1934 to 1936. He stated that his involvement in the organization consisted of attending meetings, distributing literature and paying dues. He told the investigator that he considered the League to be "synonymous" with the Communist Party, U.S.A. Furthermore, in the course of this investigation Rodriguez revealed that in 1936, or so, he was a member of the American Labor Party and that he attended meetings and rallies sponsored by that organization. Mr. Rodriguez told the investigator that he failed to disclose these facts because he feared that so doing "would make any service to the United States Government impossible and make it impossible to secure unbiased hearings of the facts." [1]

The Air Force, on March 4, 1965, began an adverse action of proposed removal charging appellant with the making of intentional false statements concerning his affiliation with certain proscribed organizations on three official forms. In his reply to these charges, Rodriguez admitted the truth of his sworn statement of 1964 and stated that his prior failure to disclose his membership in the Young Communist League and American Labor Party was based on a fear of endangering his employment status with the Air Force. In the form of a defense the appellant called the Agency's attention to his prior exemplary work record, his service in the military and his involvement with his community. Further, Rodriguez alleged that he did not understand the questions which he was accused of falsifying.

After considering his written submission the Air Force advised appellant that the charges against him had been sustained and that his removal from service would become effective on May 14, 1965. At that time the appellant requested, and was accorded, a grievance appeal as provided for by Air Force regulations. The Commander, Space Systems Division, appointed an Ad Hoc Committee to hear appellant's case with the grievance hearing being held on May 27, 1965, at the Los Angeles Air Force Station, El Segundo, California. Appellant was represented by competent counsel at the hearing.

At the very outset of the hearing appellant's counsel stated: "It is not going to be the position of [appellant] that a false statement was NOT made. This is quite obvious. . . . [W]e will not disagree with the obvious fact that a false statement was made. . . ." (Hearing Tr. 9–10.)[2] There were a good

---

1. Government Brief, Exhibit A, pp. 41–43.

2. At no time in the proceedings did appellant or his counsel deny that the alleged

number of witnesses called on appellant's behalf who testified to his good character and his prior work record. We do not need to recount this testimony since these matters are not at issue. The Government concedes that Mr. Rodriguez had an excellent work record and was highly regarded in his community. During the course of the testimony Colonel Clifford R. Silliman, a former supervisor of the appellant and the officer who initiated the removal action, stated that he had made serious attempts to determine whether a lesser penalty could be imposed as to appellant and he concluded that there could not. Colonel Silliman testified that if he believed he could have invoked a lesser penalty, he

> would have given it very serious thought. I think falsification of any official document . . . is a serious offense. . . . I think the action I took speaks for itself. . . . If I had been able to have gotten anything specific or factual that would have given me strong support in going for a lesser penalty, I would have gone in that direction.

(Hearing Tr. 65–67.) It was the Colonel's further testimony that he did not apply the regulation mechanically and that he acted only after consulting with the appropriate and informed parties.

Following the Colonel, appellant testified on his own behalf and admitted his association with the Young Labor Party in the mid-1930's and that he intentionally denied this fact on federal employment forms inquiring about present or prior affiliation with Communist and Communist-related organizations. Rodriguez testified that he falsely answered questions regarding Communist affiliations on "numerous [federal] forms after 1948 for various jobs and clearances up to and including . . . 1963. . . . " (Hearing Tr. 87.) Appellant explained his motivation for his action in the following terms: "I had the feeling . . . that it would be difficult, if not impossible, to find anyone to accept me if such statements [concerning membership] were made." (Hearing Tr. 94.) Rodriguez admitted, on the record, that he knew he had answered the membership questions falsely and that as he understood the questions they pertained to "any associations for any period of time." (Hearing Tr. 102.)

Findings of fact were filed by the Ad Hoc Committee on June 22, 1965. They found that Rodriguez had wilfully and deliberately falsified answers to inquiries in three official forms and that he thereby violated Air Force Regulation 40–712 as charged. The Committee concluded that "authority could/should have been obtained for assignment of a penalty less severe than removal." (J. A. Ex.I(D).) The findings were sent to the Base Commanding Officer, Major General Ben I. Funk, who concurred in the Committee's findings, but not its recommendations. In his letter to Rodriguez, General Funk gave two reasons for sustaining the removal action.

> a. By your own admission, your negative answers to the questions referred to were deliberate falsifications because you were fully aware that your opportunity for employment would

---

misrepresentation had been made. In the argument on the cross-motions for summary judgment, the following colloquy took place between appellant's counsel and the court.
 [Appellant's Counsel]: [A]s a young man he gets on to the left-wing side of life, then some thirty years later he is asked to pay the price simply because he did not put down on a form made out in 1963, some twenty years after he was first employed by the United States Government, more than that from the time he became a member of the Army,

he simply does not answer that he was a member of the Young Communist League. . . .
 The Court: . . . In making his application, so far as I can see from the record, he intentionally omitted and said he hadn't belonged to this, he knew he had. He did it because he was afraid of the consequences of it, although hopefully the consequences would have been nothing if he had done it. And that was his great error. [Sic]
J.A. 77.

have been diminished had you answered the questions truthfully.

b. I find that the penalty imposed was appropriate and in accord with applicable rules and regulations.

(J.A. Ex.I(E).)

Appellant appealed the decision of General Funk to the Civil Service Commission. In a letter of September 9, 1965, the Commission's Regional Appeals Officer informed appellant that he found that the Agency had complied with all Procedural requirements of the Air Force regulations and that the removal penalty was justified. (J.A. Ex.I(F).) This finding was subsequently sustained on appeal by the Civil Service Commission Board of Appeals and Review. Appellant made numerous attempts to have the Commission reopen the case; however, each request was denied. After a further attempt at re-employment at his prior place of employment appellant filed this suit.

## II.

At argument and in his brief appellant relies extensively on a line of cases which have stricken various statutes and loyalty oaths as being unconstitutional because they were vague or because the statute was so broad as to make meaningful compliance impossible. *See, e. g.,* Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (faculty loyalty oath unconstitutional as vague); Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961) (teachers' loyalty oath unconstitutionally vague); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (oath required by a New York act prohibiting treasonous and/or seditious teaching unconstitution-

ally vague). These cases are not persuasive. In the instant case there is one factor which serves to distinguish the cases cited above as well as all of the other authority relied on by appellant; in the instant case appellant falsified information required on Government forms.[3] The central issue in this appeal, although at times the parties appear to have lost sight of it, is whether the Air Force had the authority to discharge Rodriguez for falsifying answers on various employment forms. There is no question here as to loyalty, the quality of appellant's prior service, or whether he in fact did belong to the organizations at which inquiry was directed. The record is clear as to all of these matters. The simple fact is that appellant falsely answered material questions put to him concerning prior associations. He knew that the truthful answers to these questions could possibly jeopardize his chances of government employment or advancement. Appellant made a conscious decision based upon the options he believed open to him. He could have, and indeed should have, admitted his past activities and allowed the Government to investigate his past and if they were satisfied that he met the standards for federal employment he would have been granted a job. This power is inherent in government. "[W]e [do not] question the power of a State to safeguard the public service from disloyalty." Cramp v. Board of Public Instruction, *supra,* 368 U.S. at 288, 82 S.Ct. at 281. The other alternatives available to appellant were: (1) not to seek any employment which would require disclosure of past affiliations, or (2) to engage in the course of action which he chose. This latter alternative was fraught with potential hazards and appellant ran the risk of discovery. We can show no

---

3. Appellant also places extensive reliance on the line of cases holding that Communist Party membership or affiliation is not sufficient reason for denying employment, bar membership, etc. *See* Application of Stolar, 401 U.S. 23, 91 S.Ct. 713, 27 L.Ed.2d 657 (1971); Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

sympathy now that this discovery has taken place.

On a number of occasions the Supreme Court has considered the charge that a statute or regulation was unconstitutional as mitigation for the acts of a party. In Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) the Court stated:

> In Kay v. United States, 303 U.S. 1 [58 S.Ct. 468, 82 L.Ed. 607], this Court upheld a conviction for making false statements in connection with the Home Owners' Loan Act of 1933, without passing upon the claim that the Act was invalid. The Court said, "When one undertakes to cheat the Government or to mislead its officers, or those acting under its authority, by false statements, he has no standing to assert that the operations of the Government in which the effort to cheat or mislead is made are without constitutional sanction." 303 U.S., at 6, 58 S.Ct. at 471.
>
> The governing principle is that a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit. One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional. This is a prosecution directed at petitioners' fraud. It is not an action to enforce the statute claimed to be unconstitutional.

*Id.* at 866–867, 86 S.Ct. at 1847. In the *Kay* case the Court observed:

> It might as well be said that one could embezzle moneys in the United States Treasury with impunity if it turns out that they were collected in the course of invalid transactions. . . . Congress was entitled to protect the government against those who would swindle it regardless of questions of constitutional authority as to the operations that the government is conducting. Such questions cannot be raised by those who make false claims against the government.

Kay v. United States, 303 U.S. 1, 6–7, 58 S.Ct. 468, 471, 82 L.Ed. 607 (1938) quoting United States v. Kapp, 302 U.S. 214, 217–218, 58 S.Ct. 182, 82 L.Ed. 205 (1937). The point which we make is a simple one. Appellant could not make false statements concerning his past to the Government in order to secure employment and then challenge the constitutionality of the questions posed to him. Had appellant chosen to attack some constitutional infirmity, and stand on his attack, it is possible that he might have been successful. This attack could have been founded in a refusal to answer the questions presented. The constitutional issue, however, is only now being raised as a defense. We reject this argument and refuse to deal with the question of constitutionality, which most certainly has not been properly placed before this court.

### III.

█ Appellant was discharged for making a false statement. According to the Air Force's regulations false statements may be either minor or major. The penalty for a major offense is removal. The following is given as an explanation of a major false statement or misrepresentation:

> Deliberate misrepresentation; fraud, falsification, exaggeration, or concealment of a material fact in connection with any official document, or withholding of material facts in connection with matters under official investigation.

*See* Air Force Regulation 40–712, Attachment 2. Appellant asserts that removal was too severe a penalty and claims that by imposing this penalty the Air Force has contravened the spirit of its own regulations. We have considered each of these assertions but are forced to reject them. Under the terms of AFR 40–712(1) the Air Force establishes that its policy is one in which

> Primary emphasis will be placed on preventing situations requiring disciplinary actions . . . The supervisor will keep in mind that the ob-

jective of disciplinary action is to correct and rehabilitate, not to punish or penalize.

AFR 40–712(7) states:

*Removal.* Removal is the most severe type of adverse action. Before it is initiated, the facts and circumstances in an individual case must be carefully analyzed and must support the conclusion that the employee has clearly demonstrated his unwillingness or refusal to conform to the rules of conduct. Normally, a progression of disciplinary measures will be applied in an effort to rehabilitate an employee before determination is made to remove him.

It is true that the Ad Hoc Committee recommended a lesser penalty than removal to General Funk. It is also undeniably established in the record that the appellant had a superior work record and was highly thought of by his superiors. It is even true that the Director of Personnel for the Secretary of the Air Force stated that appellant could be re-employed at any Air Force installation for any position vacancy for which he was qualified and with the same security clearance as he held on his removal. All of this, however, does not change our state of affairs. Appellant falsified Government forms, was caught, and was removed by his commanding officer. The fact that the Air Force is willing to re-hire appellant does not lessen the impact of his act.

We believe that the commanding officer was justified in the action he took. "Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust." Garner v. Board of Public Works, 341 U.S. 716, 720, 71 S.Ct. 909, 912, 95 L.Ed. 1317, rehearing denied, 342 U.S. 843, 72 S.Ct. 21, 96 L.Ed. 637 (1951). "[T]he truthfulness of a man is material in estimating his reliability." Harrison v. McNamara, 228 F.Supp. 406, 408 (D.Conn., 1964), affirmed per curiam, 380 U.S. 261, 85 S.Ct. 954, 13 L.Ed.2d 960 (1965). While it is axiomatic that the Government cannot dis-

charge an employee on either arbitrary or discriminatory grounds, Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), absent such a showing by appellant the removal must be allowed to stand. There seems to be a general feeling that General Funk over-reacted in removing appellant for this offense. However, this court has no power to review penalties of this nature where the action is justified. We may not have imposed the same penalty on appellant but that was a determination to be made by the General, in his sound discretion, after considering all of the evidence, submissions of the parties, and the recommendations of the Ad Hoc' Committee. General Funk was not bound by the Ad Hoc Committee report. It was just one of a number of factors to be taken into consideration in reaching his determination. Because we might not agree with the General's disposition of this case is no reason to upset his findings absent a showing that his actions were either arbitrary, discriminatory or capricious. There has been no such showing in this case.

IV.

■ The final matter for us to consider is whether the Government could discharge a Veterans' Preference Act employee for falsifying official forms. Under the terms of the statute "[a]n agency may take adverse action against a preference eligible employee, or debar him for future appointment, only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7512 (1964). Once again, in this regard, appellant cites authority for the proposition that a Veterans' Preference Act employee cannot be discharged because of membership in or association with members of the Communist Party. *See* Cole v. Young, 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956). However, the *Cole* case and its progeny is clearly inapposite. This appellant was dismissed for falsification of records—an act which goes to

appellant's reliability, veracity, trustworthiness, ethical conduct and certainly affects the efficiency of the service.

We endorse our decision in Meehan v. Macy, 129 U.S.App.D.C. 217, 225, 392 F.2d 822, 830 (1968), remanded, 138 U.S. App.D.C. 38, 425 F.2d 469 (1968), reheard en banc, 138 U.S.App.D.C. 41, 425 F.2d 472 (1969) wherein we stated: "Since appellant has status as a Veteran's Preference Eligible, he cannot legally be discharged except for such cause as promotes the efficiency of the service." However, in this case, unlike in *Meehan* the efficiency of the service is likely to be promoted. Judge Hart stated the problem succinctly when during the argument in the District Court he said:

> The person who makes a false statement—the question is as to whether or not it promotes the efficiency of the service to discharge people that make false statements. [*Sic*]

> Somebody might, for example, in an office, steal 50 cents. Well, stealing 50 cents, so what? But stealing is what is bad. They might have been the finest employee on earth, but you can't afford to have them around.

(J.A. 92.) Thus, the crux of the matter is the question of reliability. General Funk was justified, in our opinion, in questioning appellant's reliability and in determining that his removal would promote the efficiency of the service.

We do not take issue with appellant's fears concerning his past associations and memberships and their effect on his present life. Appellant, like thousands of other loyal Americans, made a mistake many years ago. Many of these people are responsible and trustworthy persons holding important positions in both the public and private sectors of commerce, industry, education, defense, etc. They have admitted to associating with parties belonging to the Communist Party or have admitted to membership themselves. The Government is entitled to investigate the competence, loyalty and suitability of its employees and prospective employees. In this case after the Government's investigation Mr. Rodriguez was informed that his past associations would not disqualify him from re-employment. Had appellant told the truth initially he could have possibly avoided a great deal of anxiety, apprehension, public scorn, and ill-repute for his earlier acts. Appellant's dilemma was brought about by false statements not his past associations. The judgment of the District Court, is, therefore,

Affirmed.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

By its decision today this court, in my judgment, lends its prestige to the commission of an unnecessary and, hence, wholly gratuitous injustice. Simply put, the majority approves the dismissal of a loyal, dedicated federal employee because he used the only means available to protect himself against an unconstitutional assertion of government power. It does so despite its "general feeling that General Funk over-reacted in removing appellant for this offense" and its recognition that the General's action "may be indicative of a degree of governmental overkill." Before today, I had not thought this court powerless to deal with such "governmental overkill." Nor had I imagined that decisions by this or any other court precluded provision of a remedy for the unjustifiable governmental snooping into the private affairs of its employees revealed on this record.

There was a time when dismissal of an employee like Rodriguez on facts such as these would have barely called for comment. In the decade following the end of World War II, scores of loyal, patriotic Americans had their names besmirched and careers ruined when they were caught up in the vicious, irrational paroxysm of fear and rage known as McCarthyism. *See* In re Stolar, 401 U.S. 23, 25, 91 S.Ct. 713, 27 L.Ed.2d 657 (1971). Although the McCarthy movement failed in its ultimate goal of imposing ideological uniformity upon this country, it nevertheless did irreparable injury to the social fabric—injury which plagues us to this day. Still, it seems

clear that the long, tortuous process of reconstruction has now begun in earnest. As the President travels to Moscow and Peking, more and more Americans have come to realize that past fear for our internal and external security was greatly exaggerated, that the ghosts which stalked "the haunted fifties" were largely products of our own imaginings. Policies thought "treasonable" 20 years ago are today pursued by the President himself, and past judicial decisions which "balanced away" precious First Amendment freedoms are being reversed or sharply limited. *Compare, e. g.*, Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952), and In re Anastaplo, 366 U.S. 82, 81 S.Ct. 978, 6 L.Ed.2d 135 (1961), with Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971).

In this context, I can see no purpose to be served by adding one more innocent civil servant to the list of martyrs. Surely by now we have had enough of senselessly ruined lives followed by futile posthumous rehabilitations. Because I believe the time has come to put the last remnants of McCarthyism behind us, I must respectfully dissent from the majority's decision.

## I

Even the hastiest perusal of the record in this case makes clear that when Rodriguez was discharged the real loser was his employer, the United States Air Force. For 27 years, beginning with his Army enlistment in 1938, appellant rendered continuous, outstanding service to the United States. Entering the Army as a private, he had, by the time of his discharge in 1946, risen to the rank of major and received the American Defense Ribbon and Good Conduct Medal. *See* Statement of Facts in Support of Plaintiff's Motion for Summary Judgment Pursuant to Local Rule 9(h), Joint Appendix at 28–29. Shortly after his release, he entered the civil service where he held a number of responsible, sensitive

positions until his removal in 1965. *See id.* at 29–30. During this period he received many special commendations from his superiors for "devotion to duty, loyalty and willingness to tackle numerous difficult problems" and for his "exemplary performance." *See id.* at 30–31. In the 1950's Rodriguez received a scholarship to Princeton University known as the "Rockefeller Public Service Award," *id.* at 29, and was active in his spare time organizing and commanding the 6164th United States Air Force Reserve R & D Unit of the Air Force Reserve Center in Santa Monica, California. *See id.* at 30. At the time of his removal, appellant's immediate superior testified that Rodriguez was the "hardest worker in the office," Transcript at 22, and that it had not been possible to fill his position. *Id.* at 24. Another superior testified that the quality of appellant's work was "excellent," Tr. at 39, and that the division would "suffer" if the removal were sustained. *Id.* at 40. Still another superior put appellant "in the top five" of the 70 employees in the office, and stated that appellant was "second among these five in the quality of his work, the personal professionalism that he exhibits * * * and the complete manner in which he carries it out." *Id.* at 49.

Against this otherwise unblemished record of achievement and dedication, the Government can point to only two facts arguing for removal. First, for a brief period in the 1930's Rodriguez was associated with two allegedly Communist dominated organizations. This association occurred when Rodriguez was in his early 20's and at a time when, according to the Supreme Court, "the Communist Party was a lawful political party with candidates on the ballot in most States." Schware v. Board of Bar Examiners, 353 U.S. 232, 244, 77 S.Ct. 752 (1957). Second, when some 30 years later the Government illegally sought to inquire into this legitimate political association, Rodriguez, fearful that he might lose his livelihood if he told the truth or remained silent, and doubtful

that the Air Force would listen to any explanation of the nature of his activity, was untruthful in his response.

When these facts are examined as a whole, I am at a loss to understand how they can be said to support appellant's removal under the applicable statutes and regulations. The Government does not contend that the bare fact of Rodriguez's past membership in Communist organizations would justify removal. Nor would such a contention be plausible in light of the many Supreme Court decisions holding that mere Communist Party membership can be entirely innocent and is no reflection on moral character. *See, e. g.*, Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). But while conceding that Communist Party membership is not a ground for removal, the Government nonetheless argues that appellant's prevarications in response to inquiries about his membership do provide grounds for removal. In support of this argument, the Government points to the "Table of Offenses and Penalties" attached to Air Force Regulation No. 40–712 which specifies "removal" as the penalty for false statements or misrepresentations.[1]

If that were the end of the matter, I would certainly have to agree that removal was justified under—indeed, mandated by—the regulations. But statutes and regulations are meant to be read and interpreted in their entirety. When this regulation is so read, we come upon AFR 40–712(9) (b) which states:

> " * * * *The table will not be used mechanically.* A supervisor must consider the circumstances carefully when evaluating offenses and penalties. The work history of the individual and his contribution to the Air Force, his reputation in the community, and the opportunity for rehabilitation will be considered, as well as elements of enticement and provocation, and the consequences of the offense. * * * *Determine each case individually.*" [2] (Emphasis added.)

I think a fair reading of the record makes indisputably clear that in this case the Table was "used mechanically" contrary to the obvious intent of the drafters.[3] Indeed, it is striking that at each level of these proceedings the decision making officials have stated that they would have given Rodriguez a lesser penalty if the regulations provided that option.[4] Thus Colonel Silliman, who took

---

1. The Table actually differentiates between major and minor misstatements. If the misstatement is major, removal is listed as the appropriate penalty for the first offense. If the misstatement is, minor, a first offense is punishable by either an official reprimand or suspension for up to 10 days. A second minor offense, however, is punishable by removal. Since appellant lied in response to more than one question, the Government argues, he is guilty of a second offense and therefore should be removed even if the misstatement was minor. However, this position seems to overlook the provision in AFR 40–712(9) (c) which states: "Before taking disciplinary action for a second offense, it must be determined that disciplinary action was taken for the first offense." Since no such determination was made here, apellant's removal is only permissible if his misstatement was "major."

 The disciplinary regulations have now been recodified without substantive change relevant to this case as AFR 40–751.

2. This provision is now recodified as AFR 40–751(8) (b) (2).

3. It goes without saying, of course, that the Air Force must follow its own regulations when it institutes removal proceedings. *See, e. g.*, Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

4. True, General Funk approved appellant's dismissal although he could have imposed a lesser sanction. But the General's terse notice of decision nowhere explains his choice of penalty or indicates that he had considered the mitigating factors which AFR 40–712 requires be considered. *See* Notice of Decision, JA Exhibit E. While the Civil Service Commission affirmed the General's decision, the Commission confined its review to the questions whether the substantive offense had been committed and whether the proper procedure had been followed. Once again, the Commission's decision is entirely silent on the

the initial action removing appellant, testified that he did so because the applicable regulations gave him no alternative and that he would give "very serious thought" to reinstatement if such an alternative could be found. *See* Tr. at 63–65. The *ad hoc* committee established to review appellant's dismissal found that "authority could/should have been obtained for assignment of a penalty less severe than removal." *See* JA Exhibit D. Judge Hart, during the argument in the District Court on cross-motions for summary judgment, asked rhetorically, "[D]on't you think they [the Air Force] used a bit of overkill here?" JA at 108, and stated, "The Government takes well the most stringent step they could have taken and fired him, which in view of his record to me does not make any sense * * *," *id.* at 77–78. The tragedy moves to its inevitable conclusion in this court where the majority finds that the Air Force probably "over-reacted in removing appellant for this offense" but nonetheless concludes that "this court has no power to review penalties of this nature."

In fact, however, this tragedy is inevitable only insofar as our own inaction makes it so. It is not written in the stars that Rodriguez should be removed. When it is thought at every level that appellant should keep his job, but he nonetheless loses it, the result is explicable only in terms of a "mechanical" application of the regulations—the very thing which the regulations themselves forbid. When "the work history of the individual and his contribution to the Air Force, his reputation in the community and the opportunity for rehabilitation" all argue for a lesser penalty, but the most severe penalty is nonetheless inflicted, the conclusion is inescapable that the "case" was not determined "individually" as required by the regulations.

I submit that this court has "no power" to correct this abuse only because it

refuses to use the power which it has been given. We are not dealing here with a matter of substituting some court's judgment for the judgment of the fact finder. We are dealing instead with an agency of government which has ignored its own regulations—the very sort of abuse which courts have stood ready to correct since the genesis of administrative law. *See, e. g.,* United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). We cannot avoid the fact that the Air Force has here inflicted the most severe penalty available to it without giving any indication that it has considered the mitigating factors which AFR 40–712 demands be considered. No amount of piously expressed regrets about the outcome of this case can mask the fact that officials up and down the line have pointlessly flaunted their own impotence in the face of an evil which could easily have been corrected.

Nor is it necessary to rest on the general admonition against "mechanical" punishments contained in the regulations to conclude that the Air Force has, in this case, failed to "play by the rules." The regulations are also quite specific about removal and about the factual predicate which must exist before this extreme penalty may be utilized.

"Removal is the most severe type of adverse action * * *. Before it is initiated, the facts and circumstances in an individual case must be carefully analyzed and must support the conclusion that the employee *has clearly demonstrated his unwillingness or refusal to conform to the rules of conduct* * * *. * * *

* * * * * *

"b. *Normally, a progression of disciplinary measures is applied in an effort to rehabilitate an employee before deciding to remove him.* * * *"

AFR 40–712(7).[5] (Emphasis added.)

It must, of course, be conceded that these regulations vest considerable dis-

---

subject of the AFR 40–712 requirements. *See* JA Exhibit F.

5. This provision is now recodified as AFR 40–751(9) (e).

cretion in Air Force officials. But while judicial review is generally unavailable when "agency action is committed to agency discretion by law," 5 U.S.C. § 701 (1970), courts may "hold·unlawful and set aside agency action, findings, and conclusions found to be * * * an abuse of discretion." 5 U.S.C. § 706 (1970). Where, as here, the Air Force imposes "the most severe type of adverse action" to punish one isolated, understandable offense in an otherwise exemplary 27-year career, I think an abuse of discretion has been clearly made out. Certainly such an abuse is present in a case such as this where there has been no "progression of disciplinary measures" as the regulations require and where there is not a scintilla of evidence in the record to support the view that appellant has "demonstrated his unwillingness or refusal to conform to the rules of conduct." Indeed, a fair reading of the record makes plain that appellant has in fact been completely "rehabilitated" and that his misconduct is exceedingly unlikely to be repeated.[6] Surely, if the appellee in this case were a normal administrative agency and the appellant a railroad or a television station, we would not approve an administrative action taken on a record so barren of evidence as to the facts necessary to make the agency action lawful. I fail to understand why this court is willing to impose a lesser standard when it is not a corporate merger or utility rate, but a man's livelihood and reputation, which are at stake.

Moreover, even if one concedes, *arguendo*, that the Air Force has fully complied with its own regulations in this case and that the facts required by those regulations are established by substantial evidence, those conclusions still do not end the matter. Appellant is a veterans preference employee, and the statute requires that such an employee may not be removed unless it is found that his removal will "promote the efficiency of the service." 5 U.S.C. § 7512 (1970). *See generally* Cole v. Young, 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956).

I am aware of the fact that in the past removal of certain employees who have lied in response to questions such as those involved in this case has been found to "promote the efficiency of the service." *See, e. g.*, United States v. Marzani, D.D.C., 71 F.Supp. 615 (1947), affirmed, 83 U.S.App.D.C. 78, 168 F.2d 133, affirmed, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948). I also recognize that what does and what does not promote the service's efficiency in a particular case is a matter of opinion about which rational men may differ. *See* Meehan v. Macy, 129 U.S.App.D.C. 217, 225, 392 F.2d 822, 830 (1968). Nonetheless, it seems to me that if the Veterans' Preference Act is to be read as ever giving civil service employees added protection, it should be read to protect appellant in this case. Once again, there is not a whit of evidence in the record demonstrating that removal of Rodriguez in any way promoted the efficiency of the service. On the contrary, appellant's immediate superior testified that the Air Force would "suffer" if the removal were sustained and that it would be "in the best interests of the government" if he were reinstated. Tr. at 26–27. Even Colonel Silliman, who had initiated the discharge, testified that appellant's removal had caused a *"loss of efficiency"* in his office. Tr. at 62. (Emphasis added.) Indeed, I find it impossible to understand how the Air Force can maintain that Rodriguez's removal promoted the efficiency of the service while at the

6. Thus the record shows that appellant's 27-year career with the Government is virtually spotless. The one blemish on that record, which gave rise to these proceedings, stemmed from appellant's desire to keep his past political conduct secret. Before these proceedings began, appellant openly admitted that conduct in a candid and detailed statement given to his superiors. *See* Appendix to Appellee's Brief, Exhibit A. Now that that conduct is a matter of public record it seems highly unlikely that the occasion giving rise to appellant's untruthfulness will ever occur again.

same time stating that it "will not interpose any objection to his * * * re-employment with the Air Force," JA at 42, and that he "is eligible for re-employment at any Air Force installation for any position vacancy that exists for which he is qualified. He can be authorized a clearance for access to the same degree of classified information he had when he was previously employed at the Space Systems Division." *Id.* at 43.[7]

## II

I hope nothing I have said above will be read as approving comprehensive judicial supervision of the military discipline system. I share the majority's reluctance to embark on such a course and agree with my brothers that sensitive questions about what constitutes an appropriate sanction and what actions promote the efficiency of the service should be left in most instances to front line officials. Occasionally, however, when the normal administrative mechanisms have clearly broken down, I believe judicial intervention is warranted. *Cf.* Office of Communication of United Church of Christ v. FCC, 138 U.S.App.D.C. 112, 119, 425 F.2d 543, 550 (1969). It seems to me this is obviously such a case. A remand in this situation would not upset a discretionary decision carefully arrived at. It would, instead, make clear to Air Force officials that they have discretion and that removal need not flow as an automatic consequence from discovery of appellant's misconduct. I think such a remand can only strengthen the administrative system which must func-

tion properly if severe injustice is ultimately to be avoided.

Moreover, such a remand is particularly appropriate in light of the constitutional issue which casts a long and ominous shadow over these entire proceedings. For it must be recognized that appellant did not lie in response to any of the ordinary sorts of questions which the Air Force asks its civilian employees. Rather, he lied in response to a series of questions which the Supreme Court has declared the Air Force had *no right to ask* and which inexcusably invaded his personal and political privacy.

At least since 1957 it has been clear that the Government cannot take adverse action against a citizen because of his affirmative answer to questions concerning past political associations. *See* Schware v. Board of Bar Examiners, *supra.* In order to take such action, the Government must demonstrate not only that the citizen was associated with an organization engaged in illegal activity, but also that the association was "knowing" and with the specific intent of furthering the illegal conduct. *See* Keyishian v. Board of Regents, *supra,* 385 U.S. at 600, 87 S.Ct. 675, 17 L.Ed.2d 629; Elfbrandt v. Russell, *supra,* 384 U.S. at 16, 86 S.Ct. 1238, 16 L.Ed.2d 321.

Until recently, however, it has been assumed that, although the Government could not punish innocent membership in a subversive organization, it could inquire into such association in order to lay the groundwork for further investigation which might reveal illicit membership.[8] *See, e. g.,* Konigsberg v. State

---

7. Athough the willingness of the Air Force to rehire Rodriguez speaks volumes as to the seriousness of its interest in removing him, appellant derives little practical benefit from this largesse. The general decline in the number of civilians associated with the Air Force means there is only a small chance of a position opening for Rodriguez any time in the near future. *See* JA at 105–107.

8. This formulation puts to one side for the moment questions about political activity which are so vague that they cannot be

answered or so overbroad that they can serve no conceivable legitimate governmental purpose. *See, e. g.,* Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed. 2d 377 (1964); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). The Supreme Court firmly put this notion to rest last term in Baird v. State Bar of Arizona, *supra,* and In re Stolar, *supra.* *See also* Law Students Civil Rights Research Council v. Wadmond, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971). Using language which permits no doubt or equivocation, the Court held:

> "The First Amendment's protection of association prohibits a State from excluding a person from a profession or punishing him solely because he is a member of a particular political organization or because he holds certain beliefs. * * * Similarly, when a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas * * * discourage citizens from exercising rights protected by the Constitution. * * * "

Baird v. State Bar of Arizona, *supra,* 401 U.S. at 6, 91 S.Ct. at 706. *Cf.* Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

After *Baird* and *Stolar,* it is abundantly clear that the state had no constitutionally valid interest in receiving accurate answers to the illegal questions it propounded to Rodriguez. It is also clear that Rodriguez could not have been removed for his failure to answer the questions since the state's "need to know" was outweighed by the chilling effect which broad inquiries into unpopular political activity creates.

Nonetheless, the Government argues that it can punish Rodriguez for lying in response to these questions even though the Air Force had no constitutionally legitimate interest in a correct answer. It seems to me, however, that at very least *Baird* and *Stolar* throw substantially new light on the discretionary deci-

sions which Air Force officials were required to make, and that the case should be remanded for reconsideration in view of these intervening constitutional developments. It should be noted, for example, that the applicable regulations permit Rodriguez's discharge only if his offense is "major." *See* note 1 *supra.* A "major" offense is, in turn, defined as the falsification of a "material" fact. *See* AFR 40–712. I think a serious question can be raised as to whether a fact which the Air Force has no right to know and which it could not act upon if it did know can be characterized as "material." Surely the Air Force should be given an opportunity to consider this question in the first instance—an opportunity foreclosed by the majority's disposition of the case.

Moreover, even if the Air Force still chooses to push its power to the limit and insist on removal, I am far from convinced that the constitutionality of such action can survive *Baird* and *Stolar.* Since those cases make clear that the Air Force questions invaded constitutional rights enjoyed by Rodriguez, the issue may be framed in terms of whether it is permissible for the Government to punish appellant's utilization of this particular remedy to combat the invasion. I recognize that in Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), the Supreme Court put substantial limits on the extent to which prevarication can be utilized to remedy constitutional deprivations. *See also* Ogden v. United States, 9 Cir., 303 F.2d 724 (1962); Frasier v. United States, 1 Cir., 267 F.2d 62 (1959). In *Dennis* the Court held that a defendant charged with criminal conspiracy to defraud the Government lacked standing to challenge the constitutionality of the question to which he supplied a false answer.

I do not believe, however, that *Dennis* can or should be read as foreclosing the right to lie in answer to an unconstitutional question at all times and under all circumstances. Indeed, the Supreme Court itself substantially limited the sweep of *Dennis* in the subsequent case

of Bryson v. United States, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969). In the course of upholding 'another conviction for defrauding the Government in a situation similar to *Dennis*, the Court stated that it had "no need to decide" whether a person could be punished for lying in response to an unconstitutional question "if at the time the request for information was made a court had already authoritatively determined that the statutory basis [for the question] was invalid." 396 U.S. at 71 n. 11, 90 S.Ct. at 360. Here, in fact, a court had authoritatively determined the invalidity of at least some of the questions asked appellant as of the time they were asked. Thus appellant is accused of lying in response to the following questions:

"Are you now or have you ever been a member of any organization, association, movement, group or combination of persons which advocates the overthrow of our constitutional form of government, or which has adopted the policy of advocating or approving the commission of acts of force or violence to deny other people their rights under the Constitution of the United States, or which seeks to alter the form of government of the United States by unconstitutional means?"

"Are you now associating with, or have you associated with any individuals, including relatives, who you know or have reason to believe, are or have been members of any of the organizations identified above?"

"Have you ever engaged in any of the following activities of any organization of the type described above: contribution(s) to, attendance at or participation in any organizational, social or other activities of said organizations or any projects sponsored by them: the sale, gift, or distribution of any written, printed, or other matter, prepared, reproduced, or published, by them or any of their agents or instrumentalities?"

Notice of Proposed Removal, JA Exhibit A.

Long before *Baird* and *Stolar*—and indeed long before these questions were posed to appellant—the Supreme Court had struck down similar inquiries as too vague and all-embracing to give fair warning as to what activity was included and what excluded. *See, e. g.*, Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961). *See also* Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). Whatever the limits of the *Dennis* doctrine, surely it does not require punishment for answering falsely a question which is unconstitutional at the time it is asked for the very reason that it is too vague to permit an accurate response. It follows that Rodriguez's dismissal rests, at least in part, on a ground which is not constitutionally tenable and that the case should be remanded for reconsideration in light of this constitutional adjudication. *See* Meehan v. Macy, *supra*.

True, appellant lied in response to other questions which were considerably more specific and which, although unconstitutional now, were constitutional when asked. But I have grave doubts as to the constitutional propriety of punishing false answers to even these questions given the fact that lying was, in my view, the only remedy available to appellant that would fully protect his constitutional rights. It must be remembered that in *Dennis* the Court found that there existed "[a]mple opportunities * * * to seek and obtain judicial protection," 384 U.S. at 866, 86 S.Ct. at 1847, without use of the extraordinary method adopted by the defendants in that case. The *Dennis* Court specifically put to one side the situation where "the constitutionality of a statute is challenged by those who of necessity violate its provisions," *id.* at 865, 86 S.Ct. at 1846, because in *Dennis* a fully effective remedy was available without such a violation.[9]

---

9. Admittedly, it is not altogether clear when one must violate a statute "of

necessity" in order to challenge it. One can easily imagine a case, however, where

It is precisely this issue, reserved in *Dennis*, which is squarely presented by this case. In *Dennis* appellants challenged as a bill of attainder a provision of the National Labor Relations Act withholding the services of the Labor Board to unions with Communist officers. *Cf.* United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). Since such a challenge could have been effectively mounted by suing for a declaration that the Board could not so withhold its services, it was reasonable for the Court to insist that appellants not confront the statute by lying in response to the questions posed.

In this case, however, appellant challenges the questions asked him, not because they constitute a bill of attainder, but because the asking of the questions chills his First Amendment rights. *Cf.* NAACP v. Alabama ex rel. Patterson, *supra*; Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). True, appellant could have refused to answer the questions and tested their validity in that manner. But the very act of invoking the legal process by refusing to answer would itself produce the constitutional evil to which appellant objected. *Cf.* Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). These questions are unconstitutional in the first place because, as the Supreme Court has recognized, a stigma is attached to membership in certain unpopular organizations, and public revelation of such membership may lead to informal, private sanctions which in turn discourage others from engaging in protected activity. *See, e. g.*, Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). It seems clear to me that such a stigma adheres not only to positive answers to such questions, but to refusals to answer as well. The phrase "Fifth Amendment Communist" may be passing from the language, but it is still true that large numbers of our citizens view evasive answers to questions about patriotism with suspicion. Thus the State of California has taken the position that a bar applicant's "refusal to tell the Examiners whether he was a member of the Communist Party * * * tends to support an inference that he is a member of the Communist Party and therefore a person of bad moral character." Konigsberg v. State Bar of California, 353 U.S. 252, 270, 77 S.Ct. 722, 732, 1 L.Ed.2d 810 (1957). Even the Supreme Court itself has on occasion found the exercise of one's constitutional right to remain silent a reflection on one's suitability for fiduciary positions. *See, e. g.*, Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156 (1961).

If these august institutions are willing to draw unfavorable inferences from refusals to answer such questions, then surely it does not tax the imagination to suppose that appellant's colleagues in the military might draw similar inferences. Moreover, I think we should notice the fact that in an organization like the Air Force these colleagues could easily subject appellant to a wide variety of informal sanctions which, while real enough, might never come to light or be judicially reviewable. *Cf.* Shelton v. Tucker, *supra*, 364 U.S. at 486, 81 S.Ct. 247. Indeed, it would not even be necessary to inflict such covert punishment, since under the law as it then stood the Air Force could have openly discharged appellant for refusal to answer the questions. *See* Konigsberg v. State Bar of California, *su-*

---

the consequences of following the statutory mode of challenge are so adverse that extraordinary self-help becomes necessary. If, for example, Congress had made failure to anwer the questions propounded in *Dennis* an offense punishable by 20 years imprisonment, one can surmise that the *Dennis* Court would have found it "necessary" for Dennis to answer the question with a lie. Rodriguez, of course, would not have been imprisoned had he failed to answer the questions put to him. But, as argued below, by remaining silent he would have suffered the very constitutional deprivation which he was attempting to remedy. I think this is a sufficiently adverse consequence to make his lie "necessary" and hence to take this case out of the *Dennis* rule.

pra, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105; In re Anastaplo, *supra*. Appellant's perception of these dangers might easily chill his desire to participate in legitimate but unpopular political activity just as effectively as would public revelation of such participation. Nor is it relevant that government may neither condone nor intend the private sanctions resulting from failure to answer the questions. "The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power * * * that private action takes hold." NAACP v. Alabama ex rel. Patterson, *supra*, 357 U.S. at 463, 78 S.Ct. at 1172. The Supreme Court has now made abundantly clear that it is unconstitutional for the state to create this chilling effect absent a "compelling" or "subordinating" countervailing state interest.

None of this is to argue that one always has a right to lie in response to an unconstitutional question. Whatever the limits of *Dennis*, it surely forecloses this extreme position. *Cf.* Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). But I would argue that we should not lightly assume that the only effective remedy for a constitutional deprivation has been foreclosed. *Cf.* Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In fact, the choice of an appropriate remedy almost always involves a balancing of competing interests and, hence, is unusually dependent on the factual context of the controversy. *See generally* Note, Defiance of Unlawful Authority, 83 Harv.L.Rev. 626 (1970). Thus defiance of an unlawful police order constitutes a permissible remedy, *see* Wright v. Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963), while defiance of an unlawful court order, at least when some other remedy is available, is impermissible. *See* Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). Similarly, one's ability to utilize a judicial remedy while ignoring administrative avenues of relief

depends on a careful weighing of the particular circumstances. *See, e. g.*, McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1968).

When the circumstances are weighed in this case, I think the balance must be struck in favor of appellant. On the one hand, appellant's only avenue of escape without suffering a constitutional deprivation was by responding to the questions dishonestly. On the other, the Government has no legally cognizable interest at all in having accurate information received in response to unconstitutional questions. It might still, I suppose, be said that the Air Force has an interest in deterring dishonesty generally or in ridding itself of a dishonest employee. But I do not believe the Government may deter dishonest answers to constitutional questions by punishing those who answer unconstitutional questions dishonestly. And even if it can be said that appellant's defense of his constitutional rights reveals a general proclivity for untruth, the Air Force's asserted interest in being rid of him rings hollow in light of its acknowledged willingness to take him back as soon as an opening appears.

### III

When all is said and done, it must still be admitted that appellant has, by his actions, made things hard for himself. Certainly, I do not wish to be taken as arguing that appellant's conduct is in any way praiseworthy or admirable. This would be a far easier case if Rodriguez had forthrightly challenged the questions asked him and courageously stood on his rights, in spite of the fact that in so doing at that time he would have doubtless risked dismissal. But if the First Amendment protected only the forthright, there would be no chilling effect doctrine. And indeed, if the Framers had thought that only the courageous spoke words worth listening to, there would have been no First Amendment at all. There will always be brave nonconformists who insist on their right to be heard no matter how severe the governmental reprisals which are mounted

against them. We need a Constitution because there are also ordinary people in this country who, while more easily intimidated, are still entitled to political freedom. Rodriguez is an ordinary person and, unfortunately, the Air Force succeeded in intimidating him.

I suggest that law is designed, and should be interpreted, to protect the average man, not to hurt him. The bravest among us may consciously choose martyrdom and be happy with their fate. But Rodriguez had no appetite for martyrdom. When presented with the cruel dilemma of refusing to answer the illegal questions or lying, he chose to protect his job and his family. Now the Government has chosen to punish him for its illegal act in demanding answers to the questions. Because I cannot believe Rodriguez committed a punishable offense by falling victim to the very evil which the First Amendment was designed to remedy, I must respectfully dissent.