James ABRAMS, Petitioner,

v.

**UNITED STATES DEPARTMENT OF THE NAVY, Respondent.**

No. 82–3400.

United States Court of Appeals, Third Circuit.

Argued March 14, 1983.

Decided Aug. 11, 1983.

Rehearing Denied Sept. 6, 1983.

---

**1.** *See* Skilton, Some Comments on the Comments to the Uniform Commercial Code, 1966 *Wis.L.Rev.* 597.

Theodore M. Lieverman (argued), Philadelphia, Pa., for petitioner.

Richard G. King, Asst. Deputy Chief of Naval Operations, Dept. of the Navy, Washington, D.C., and Peter F. Vaira, U.S. Atty., Walter S. Batty, Asst. U.S. Atty., Chief, Appellate Div., Joseph M. Masiuk, Asst. U.S. Atty., Philadelphia, Pa., and Jerome A. Snyder, Evelyn Boss Cogan (argued), Attys., Dept. of the Navy, Philadelphia, Pa., for respondent.

Before ADAMS, GARTH and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

This petition for review of a decision of the Merit Systems Protection Board requires consideration of two issues. First, must a federal agency, which has discharged an employee who has committed a violent crime during off-duty hours, introduce evidence other than proof of the conviction for the crime in order to establish a nexus between the criminal misconduct and the efficiency of the service? Second, to rebut the presumption of nexus, is it sufficient for the employee to introduce evidence that his conviction has not adversely affected his ability to perform his own job? We conclude that the Board correctly held that, on this record, the agency initially was not required to present additional evidence establishing this nexus. However, the Board erred in stating that the petitioner rebutted the presumption of nexus by showing only that his conviction had not impaired his ability to perform his own job. Accordingly, we vacate the Board's Opinion and Order of July 21, 1982, and remand for reconsideration by the Board of its holding that the petitioner successfully rebutted the presumption of nexus.[1]

1. See *Abrams v. Dept. of the Navy,* MSPB Docket No. PHO7528110312, at 4–6 (136–37 of

## I.

The Philadelphia Naval Shipyard (hereinafter "agency") hired the petitioner as a painter in July of 1974 and discharged him effective January 30, 1981, for leaving his assigned worksite without proper permission on May 21, 1980; for failing to report for scheduled, critical overtime on June 1, 1980; for conviction of several criminal offenses relating to an incident in which he shot another person during a card game; for excessive absenteeism from July 28 through October 1, 1980;[2] and for prior infractions relating to unauthorized absences.[3]

The Presiding Official of the Philadelphia Regional Office determined that the agency had proven these charges by a preponderance of the evidence and sustained the agency's action in removing the petitioner from employment. On appeal, the Board affirmed this decision in all but one respect. The Board held that the agency had not established by a preponderance of the evidence a connection between the criminal shooting and the efficiency of the service. The Board, except for this modification, concluded that the petitioner's discharge for excessive absenteeism, in light of his prior

disciplinary record for attendance problems, fell "within the limits of reasonableness."[4] This appeal followed.[5]

## II.

The Civil Service Reform Act of 1978 permits removal of an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a).[6] To dismiss an employee for his off-duty misconduct, the agency must show a nexus between that behavior and the efficiency of the service. *Yacovone v. Bolger,* 645 F.2d 1028 (D.C.Cir.1981). The Merit Systems Protection Board has interpreted this statutory requirement to mean that, where the nature and gravity of the misconduct are "egregious," a nexus is presumed. *Merritt v. Department of Justice,* No. PHO75209058 (June 8, 1981). The employee may rebut this presumption by showing an absence of adverse effect upon the efficiency of the service, thereby shifting the burden of going forward with evidence to the agency to establish, by a preponderance of the evidence, a nexus between the off-duty misconduct and the efficiency of the service. *See Hoska v. Department of the Army,* 677

Part I, Record on Appeal), July 21, 1982. The Board used the language, quoted in the appendix to this opinion, from 135–37 of the Record on Appeal (Part I). The powers and functions of the Board are prescribed at 5 U.S.C. § 1205.

**2.** The petitioner was incarcerated for these criminal offenses from July 28 through December 8, 1980. October 1 was the agency's proposed date for removing him from the service.

**3.** On November 16, 1977, the petitioner was charged with being away from his assigned job during working hours without proper permission, for which he received a two-day suspension.

On August 24, 1979, he received a Letter of Reprimand for unauthorized absence.

On August 8, 1980, the petitioner received another Letter of Reprimand for unsatisfactory attendance.

From January 14, 1979, through November 8, 1979, the petitioner was absent for 202 hours of accrued leave and had 149 hours of non-pay status and had been warned by the agency in June of 1979 and April of 1980 that his attendance record was unsatisfactory.

**4.** *See Abrams v. Department of Navy,* MSPB Docket No. PHO7528110312 at 12 and 143 of Part I, Record on Appeal, (July 21, 1982).

**5.** The dissent suggests that we may consider only issues raised by the parties on appeal. However, as the Supreme Court noted in *Hormel v. Helvering,* 312 U.S. 552, 556–57, 61 S.Ct. 719, 721–22, 85 L.Ed. 1037 (1941), in exceptional circumstances an appellate court may in the interests of justice and fairness consider questions of law not presented to the court or administrative agency below. *See also* 28 U.S.C. § 2106. *Cf. S.E.C. v. Chenery Corp.,* 318 U.S. 80, 88, 93–94, 63 S.Ct. 454, 459, 461–62, 87 L.Ed. 626 (1943), and *Higgins v. Kelley,* 574 F.2d 789, 794 (3d Cir.1978).

**6.** Subchapter II of the Civil Service Reform Act of 1978 (5 U.S.C. §§ 7511–7514), entitled "REMOVAL, SUSPENSION FOR MORE THAN 14 DAYS . . . ," states at 5 U.S.C. § 7512:

"§ 7512. Actions covered
"This subchapter applies to—
(1) a removal;
(2) a suspension for more than 14 days;
. . . ."

F.2d 131 (D.C.Cir.1982), and *Yacovone v. Bolger, supra.*

Although this presumption might suffice for certain non-violent criminal conduct or acts implicating moral turpitude,[7] the language of the Civil Service Act, particularly its legislative history and pertinent regulations demonstrate a special Congressional concern for dealing with federal employees convicted of violent criminal conduct.[8] Consequently, this type of case warrants the application of an even higher standard.

For example, 5 U.S.C. § 2302(b)(10) provides that

"Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—discriminate for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others; except that nothing in this paragraph shall prohibit an agency from taking into account in determining suitability or fitness any conviction of the employee or applicant for any crime under the laws of any State, of the District of Columbia, or of the United States."

In addition, the House Conference Report, No. 95–1717, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Ad. News 2723, 2864, captioned "Conduct Unrelated to Job Performance," states in pertinent part that

"... it is a prohibited personnel practice to discriminate for or against any employee or applicant on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others. The bill also provides, though, that nothing in the paragraph shall prohibit an agency from taking into account any conviction of the employee or applicant for any crime of violence or moral turpitude when determining suitability or fitness."[9]

Finally, 5 C.F.R. § 731.202 directs the Office of Personnel Management to consider

"(a) ... [i]n determining whether its action will promote the efficiency of the service, ... [to] make its determination on the basis of:

"(1) Whether the conduct of the individual may reasonably be expected to interfere with or prevent effective performance in the position applied for or employed in; or

"(2) Whether the conduct of the individual may reasonably be expected to interfere with or prevent effective performance by the employing agency of its duties and responsibilities.

---

7. In fact, several decisions have inferred nexus from circumstances not necessarily involving violence. *See, e.g., Cooper v. United States,* 639 F.2d 727 (Ct.Cl.1980) (sexual abuse of five-year-old child); *Masino v. United States,* 589 F.2d 1048 (Ct.Cl.1978) (off-duty transportation and use of marijuana by customs inspector); and *Hoover v. United States,* 513 F.2d 603 (Ct.Cl.1975) (falsification of own tax returns by Internal Revenue Service tax technician); but see *D.E. v. Department of Navy,* 707 F.2d 1049 (9th Cir.1983) (sexual abuse of a child did not create requisite nexus).

8. We emphasize that the off-duty misconduct at issue in this case was assault with a deadly weapon.

9. The Report continues:

"The conference report in section 2302(b)(10) adopts the House provision modified so that conviction of a crime may be taken into account when determining fitness or suitability of an employee or applicant. This provision is not meant as an encouragement to take conviction of a crime into account when determining the suitability or fitness of an employee or applicant for employment. Nor is it to be inferred that conviction of a crime is meant to disqualify an employee or an applicant from employment. The conferees intend that only conduct of the employee or applicant that is related to the duties to be assigned to an employee or applicant or to the employee's or applicant's performance or the performance of others may be taken into consideration in determining that employee's suitability or fitness. Conviction of a crime which has no bearing on the duties to be assigned to an employee or applicant or on the employee's or applicant's performance or the performance of others may not be the basis for discrimination for or against an employee or applicant."

"(b) *Specific factors.* Among the reasons which may be used in making a determination under paragraph (a) of this section, any of the following reasons may be considered a basis for disqualification:

"(1) Delinquency or misconduct in prior employment;

"(2) *Criminal, dishonest, infamous or notoriously disgraceful conduct;*

"(3) Intentional false statement or deception or fraud in examination or appointment;

"(4) Refusal to furnish testimony as required by § 5.3 of this chapter;

"(5) Habitual use of intoxicating beverages to excess;

"(6) Abuse of narcotics, drugs, or other controlled substances;

"(7) Reasonable doubt as to the loyalty of the person involved to the Government of the United States; or

"(8) Any statutory disqualification which makes the individual unfit for the service."[10]

(Emphasis supplied.)

This reference in the House Conference Report to violent criminal misconduct reflects the truism that "an employee's conviction of a crime casts grave doubt on his reliability, trustworthiness and ethical conduct, all of which naturally affect the efficiency of the service." *Gueory v. Hampton,* 510 F.2d 1222, 1226 (D.C.Cir.1974), *citing Embrey v. Hampton,* 470 F.2d 146 (4th Cir. 1972), and *Rodriguez v. Seamans,* 150 U.S. App.D.C. 1, 463 F.2d 837 (D.C.Cir.), *cert. dismissed,* 409 U.S. 1094, 93 S.Ct. 704, 34 L.Ed.2d 678 (1972). Continued employment of persons convicted of violent criminal conduct diminishes public respect for the agency and undermines its efficacy by dissuading qualified job applicants who prefer not to work with or near a co-employee who has been convicted of shooting a human being. Therefore, where a federal employee commits a violent crime during off-duty hours, a "strong and secure" presumption arises that the employee's misconduct adversely affects the efficiency of the service. *Gueory v. Hampton,* 510 F.2d at 1226.

The employee may rebut this presumption by showing not only that his off-duty conduct will not interfere with or adversely affect his performance of his job but also that his off-duty misconduct will not interfere with or adversely affect his co-employees' performance of their jobs and the overall accomplishment of the agency's duties and responsibilities. An employee may remain at his post only if he can show that his off-duty misconduct will not impede the agency's achievement of its goals directly or indirectly through its other employees while preserving the agency's exercise of discretion in making personnel management decisions. *See Vance v. Chester County Board of School Trustees,* 504 F.2d 820, 825 (4th Cir.1974) ("government must have wide discretion and control over the management of its personnel and internal affairs ... [a]nd this necessarily includes the ability to remove those employees whose conduct hinders efficient operation.").

In *Gueory v. Hampton, supra,* the Postal Service removed an employee who had committed manslaughter. The district court granted the plaintiff's motion for summary

**10.** The regulation further provides that:

"[i]n making its determination under paragraph (a) of this section, OPM shall consider the following additional factors to the extent that these factors are deemed pertinent to the individual case:

"(1) The kind of position for which the person is applying or in which the person is employed, including its sensitivity;

"(2) The nature and seriousness of the conduct;

"(3) The circumstances surrounding the conduct;

"(4) The recency of the conduct;

"(5) The age of the applicant or appointee at the time of the conduct;

"(6) Contributing social or environmental conditions;

"(7) The absence or presence of rehabilitation or efforts toward rehabilitation."

5 C.F.R. § 731.202(c).

With reference to paragraph (5) above, we note that petitioner was born November 29, 1941, and was almost 38 years old on October 14, 1979, when he shot and wounded another person during a card game, resulting in his criminal conviction on five charges (App. at 20 & 132).

judgment and held, as a matter of law, that the agency needed to show specifically how the manslaughter conviction adversely affected the plaintiff's suitability for employment. The Court of Appeals, reversing, held that the violent nature of his misconduct formed a "strong" nexus between the conviction and the efficiency of the service. Therefore, the agency did not need to offer additional evidence of impact.[11]

■ In the case at bar, the petitioner shot another individual during a poker game. A jury convicted the petitioner in state court of possession of an instrument of crime, possession of a concealed weapon, simple assault, aggravated assault and recklessly endangering another person. Conviction of these offenses raised a "strong and secure" presumption that the efficiency of the service would be adversely affected by the petitioner's continued employment with the agency. In rebuttal the petitioner offered his own testimony, during which he stated that his fellow employees were "glad" to see him return to work and that his position did not entail any public duties. In addition, he offered the testimony, elicited during cross-examination, of his supervisor, John Stull, who stated that the petitioner had never been disciplined for any violent conduct and that his conviction had not impaired his ability to perform his work.

The Board held that the petitioner's presentation of this evidence showing that his conviction had not impaired his ability to paint ships successfully rebutted the presumption of nexus. However, the Board did not consider whether the petitioner's conviction would adversely affect or interfere with the agency's overall achievement of its responsibilities and its other employees' performance of their jobs. The Board's omission erroneously relieved the petitioner of part of his burden of rebutting the presumption of nexus and, as a consequence, incorrectly imposed upon the agency the burden of introducing evidence in addition to the petitioner's conviction to establish nexus.

On remand the Board shall decide whether the petitioner introduced sufficient evidence to rebut the presumption of nexus in light of this opinion. Specifically, the Board should consider whether the petitioner's evidence showed that his conviction did not adversely affect or interfere with his performance of his own job, the performance of his co-employees' jobs and the overall achievement of the agency's goals and responsibilities.

For example, certain testimony elicited from the petitioner and from John Stull during cross-examination will be relevant to the issue of whether the petitioner's conviction adversely affected his ability to paint Navy ships.[12] Fears voiced by John Stull

---

11. In *Gueory,* the petitioner was well-liked by his co-employees, had no prior history of violence and had received a suspended sentence and five years' probation, a recognition by the sentencing judge that the petitioner posed no threat to society. The petitioner continued to work after committing the offense and after pleading guilty thereto. Finally, the petitioner, a janitorial supervisor with the Postal Service, had no regular contact with the public and did not represent the Postal Service in an official capacity.

Similarly, in the case at bar, the petitioner testified that his co-employees liked him and did not fear him. The petitioner had no prior history of violence and had been recommended for a work-release program, an indication that the sentencing judge did not perceive him to be a threat to society. The petitioner continued to work after committing the offense and after conviction thereof. Finally, the petitioner, as a painter, had no contact with the public and did

not represent the Navy Yard in an official capacity.

In *Gueory,* the Court of Appeals, holding that the manslaughter conviction alone sufficiently established nexus, concluded that the Postal Service had not abused its discretion in removing the employee for the off-duty misconduct, despite the fact that he had an exemplary past record with the agency. In contrast, the petitioner in the case at bar had a history of unexcused absence and attendance problems. *See* n. 2.

12. The petitioner testified as follows:

"Q. Mr. Abrams, you stated, I believe, that you went back to work after your release from prison?

"A. Yes.

"Q. Did you find that your conviction by the court prevented you from carrying out your duties as a painter?

and Thomas Hare of future violent conduct by the petitioner will bear upon the issue of whether the petitioner's conviction will ad-

"A. No. When I came out of jail, I still worked for the same supervisor, Mr. Stewart, the same shift.
"Q. You didn't have any new problems?
"A. No.
"Q. As a result of the time you served?
"A. No. The fellows were glad to see me back; my gang was glad to see me back."
(N.T. 99). John Stull testified as follows:
"Q. To your knowledge had Mr. Abrams' conviction in the criminal matter impaired his ability as a painter?
"A. I did not say that he could not paint.
"Q. I didn't say that you did. I'm just asking you if you have any knowledge that his conviction impaired his ability as a painter?
"A. I would say no.
"Q. Do you have any knowledge whether or not his conviction impaired his ability to perform the other related duties of his job at the shipyard?
"A. Getting along with his co-workers you mean? And things like that?
"Q. Well, I'm talking about related duties. . . . [Y]ou have never disciplined him for failing to get along with his other employees, have you?
"A. I would say no to that."
(N.T. 75).

**13.** Federal regulations, specifically contemplating a present prediction of future effect, state that "whether the conduct of the individual may reasonably be expected to interfere with or prevent effective performance" should be considered in determining if the efficiency of the service will be promoted by the agency's action. 5 C.F.R. § 731.202(a).

John Stull testified as follows:
"Q. Now, I believe you testified that prior to proposing the [petitioner's] removal, you reviewed his previous disciplinary record, is that correct?
"A. Yes.
"Q. And I believe you stated that you were concerned about Mr. Abrams' criminal conviction is that correct?
"A. Not his conviction, how it happened.
"Q. Well, you presumably found out about this because he was convicted of a criminal offense relating to that incident, is that correct?
"A. That's correct.
"Q. Let me ask you, have you ever known, have you ever disciplined or known anyone else to discipline Mr. Abrams for any type of violent conduct in the shipyard?
"A. Violent conduct?
"Q. Right.
"A. I have not.
"Q. Do you know of any?

versely affect his co-employees' performance of their jobs.[13] The petitioner's own testimony that he did not occupy a position

"A. To my knowledge, no.
"Q. You have no knowledge of Mr. Abrams ever getting into a fight of any kind, a physical fight with another employee, do you?
"A. Not to my knowledge.
"Q. Do you have any knowledge of the [petitioner] ever carrying a concealed weapon at the shipyard?
"A. No.
"Q. He was never disciplined for that, was he?
"A. To my knowledge, no.
"Q. Never disciplined for simple or aggravated assault?
"A. No, to my knowledge.
"Q. And to your knowledge he was never disciplined of [sic] any conduct which would constitute recklessly endangering another person, has he?

.    .    .    .    .

"A. I have not disciplined Mr. Abrams for that on these records.
"Q. And you don't know of any discipline as such?
"A. No, I do not.

.    .    .    .    .

"Q. Now, let me ask you, what part did that information [about the convictions] play in your decision to propose removal of Mr. Abrams?
"A. That part played, when I read that, proposed that, that I had roughly 400 and some employees and we are under constant pressure to get jobs done. Now, the card game would cause a man to shoot another man, and in our type of work, I can't risk my employees possibly to be exposed, that a man could lose his head over a card game.
"Q. You say you were concerned for the other employees?
"A. Yes.
"Q. If Mr. Abrams came back to work, is that correct?
"A. That's right."
Another supervisor, Thomas Hare, testified as follows:
"A. . . . when John [Stull] consulted me as to what my opinion would be as to the work-release program, I told him I didn't think it would be the proper step to take in this situation.
"Q. Why did you say that?
"A. Well, based on Mr. Abrams' reliability, his attendance, the fact that Mr. Abrams had resorted to shooting someone over a card game.
. . . I didn't feel as though it would be proper to have him in the situation in the shipyard where he is required to work with other people and under pressure. And I just felt ap-

visible to the public and that he did not represent the Navy in any official capacity will be pertinent to the issue of whether the petitioner's conviction adversely affected the agency's overall achievement of its goals.[14] In addition, the petitioner's unavailability for work on conditions acceptable to the Navy as a result of his conviction will be pertinent.

## III.

We conclude that the petitioner's violent off-duty criminal misconduct created a "strong and secure" presumption of nexus and that the Board erred in holding that the petitioner had rebutted this presumption by showing only that his conviction had not impaired his ability to perform his own job. Accordingly, the Board's decision approving the petitioner's discharge will be vacated and the matter will be remanded to the Board for reconsideration of whether the petitioner introduced sufficient evidence to rebut the "strong and secure" presumption of nexus between his convictions and the efficiency of the service.

prehensive about the fact that he would be in that type of environment and he would—we wouldn't know what to expect."
(N.T. 46, 72, 76).

**14.** The petitioner testified as follows:
"Q. In all the time that you worked at the Philadelphia Naval Shipyard, did you ever serve as a spokesman for the shipyard on any official policy?
"A. No.
"Q. Did anyone from the shipyard ever ask you to attend an official function of some kind as a representative of the shipyard?
"A. No.
"Q. Anyone ever send you out into the community as a representative of the shop or a spokesman for the shop?
"A. No.
"Q. Did you have any public duties at all?
"A. No.
"Q. Did any part of your job involve relationships with the public at large?
"A. My job? You mean with the people, the public?
"Q. Your job as a painter—
"A. —Right—
"Q. —You were a painter?
"A. Right.

APPENDIX

*Excerpt From Pages 4–6 of July 21, 1982, Opinion of the Merit Systems Protection Board in Abrams v. Department of the Navy, MSPB Docket No. PHO7528110312 (Pages 135–37 of Part I, Record on Appeal)*

"However, the Board also finds that appellant overcame the presumption of nexus by presenting evidence showing an absence of an adverse effect on service efficiency. *Merritt* at 30–31. John Stull, who was appellant's supervisor and proposed his removal, admitted on cross-examination that appellant's conviction had not impaired his ability to perform as a Painter. (Tr. 75.) Further, Mr. Stull attested that appellant had no prior disciplinary record of fighting or any type of violent conduct. (Tr. 73–74.) The supervisor also admitted that appellant's job performance did not involve any contact with the public at large and that appellant had never served as an official representative to the public or as a spokesperson to the press on behalf of the shipyard or the agency. (Tr. 74–75.) Finally, Mr. Stull testified that he was not afraid of

"Q. Your job as a painter involved you to deal on a regular basis with, say, outside visitors?
"A. No.
"Q. In all the time you were at the shipyard, did you ever engage in a physical fight with any employees?
"A. No.
"Q. Were you ever involved in any incidents of threatened violence?
"A. No.
"Q. Were you ever disciplined in any way for carrying a concealed weapon?
"A. No.
"Q. Were you ever disciplined or warned for recklessly endangering another person?
"A. No."
(N.T. 95–96). John Stull also testified as follows:
"Q. Did Mr. Abrams ever go out in the community and represent the shipyard as an official representative of any kind?
"A. Not to my knowledge.
"Q. To your knowledge he was never appointed, for example, a spokesperson to the press on behalf of the shipyard or the shop or anything?
"A. I would say no, to my knowledge."
(N.T. 74–75).

being in the hearing room with appellant while testifying against him. (Tr. 76.)

"Appellant testified on his own behalf that after he was released from prison on December 8, 1980, he returned to work as a Painter without experiencing any problems in carrying out his duties until he was removed. (Tr. 99.) Appellant also stated that his co-workers 'were glad' to see him back on the job. (Tr. 99.) The agency did not present any evidence to rebut appellant's testimony and conceded in its closing brief dated May 11, 1981 at p. 2, submitted to the presiding official, that appellant's criminal misconduct had no adverse impact on his ability to perform his duties as a Painter.

"Having found that appellant presented evidence overcoming the rebuttable presumption of nexus, the Board must now find whether the agency presented evidence of sufficient quantity and quality to carry its burden of proving nexus. *Merritt* at 31. Although appellant's supervisor, Mr. Stull (Tr. 72–76), and Thomas Hare (Tr. 46), another supervisor, testified generally that they were apprehensive for the safety of their employees because appellant might become violent on the job, the agency did not present any testimony by appellant's co-workers or other evidence in support of this 'forward-looking analysis' of appellant's possible future misconduct and its effect on the efficiency of the service. *See Yacovone v. Bolger*, 645 F.2d 1028, 1033 (D.C.Cir. 1981); *Barnhill v. Department of Justice*, MSPB Docket Number SFO7528110017 at 4–5 (February 24, 1982). Further, the favorable evidence elicited by appellant on the issue of nexus renders such a 'forward-looking analysis' unsupportable in this case.

"The Board finds that under the particular facts and circumstances of the instant case, the agency has not presented such facts as to establish a connection between appellant's off-duty misconduct and the efficiency of the service by a preponderance of the evidence. *Merritt* at 31. Accordingly, the third charge of the removal action based on appellant's criminal conviction for off-duty misconduct may not be sustained

for want of the requisite nexus to support such a charge."

GARTH, Circuit Judge, dissenting.

The sole issue presented by this appeal is whether the Navy may dismiss the petitioner, James Abrams, for an "excessive unauthorized absence" caused by his incarceration, when the Navy could *not* dismiss Abrams for the conviction leading to his incarceration, and when Abrams offered to participate in a work-release program with the Navy in lieu of his incarceration—but was refused. Rather than reach this issue, however, the majority addresses an issue which the Navy never appealed, let alone briefed or argued on appeal. Because the issue which the majority decides is not before us on appeal, because a remand to the Board, in light of the record before us, is unnecessary and unauthorized by statute, and because I conclude that the Navy may not dismiss Abrams, I respectfully dissent.

I.

Petitioner James Abrams is a painter formerly employed by the Philadelphia Naval Shipyard, an agency of the Department of the Navy ("the Navy"). In May and June of 1980, Abrams committed two infractions that are *not* at issue here. On May 21, 1980, Abrams made an unauthorized telephone call during work hours. On June 1, 1980, Abrams was absent without excuse from work. On the basis of these absences, the Navy proposed a ten-day suspension.

More importantly, on October 14, 1979, in an incident unrelated to Abrams' employment, Abrams shot and wounded a fellow poker player in the shoulder. The October 14 shooting led to Abrams' conviction by the Court of Common Pleas of Philadelphia, and his subsequent sentence of not less than eleven months nor more than twenty-three months. Before his incarceration, Abrams offered, with court approval, to continue to work for the Navy under the Philadelphia County Prison's work-release program. Although the Navy granted Abrams' work-release request initially, several days later the Navy informed Abrams that his request to

continue working under the release program would be denied. This action was apparently taken because of Abrams' prior infractions on May 21 and June 1.

Abrams served out his sentence of incarceration in the Philadelphia County Prison from July 28, to December 8, 1980. On October 1, 1980, however, two months before the expiration of his term of imprisonment, the Navy proposed to terminate Abrams' employment. The Navy's Notice of Proposed Removal cites five grounds for removal:

1. The May 21 absence;

2. The June 1 absence;

3. The conviction arising from Abrams' October 14 shooting;

4. An "excessive unauthorized absence" from July 28, 1980 through October 1, 1980, caused by his incarceration for the October 14 shooting; and

5. Prior infractions relating to unauthorized absences.

Abrams returned to work in December of 1980 and continued his employment until January 30, 1981, the effective date of his removal. According to Abrams' testimony, his fellow employees were "glad to see [him] back", and his conviction in no way prevented him from carrying out his duties as a painter. Thereafter, Abrams challenged his removal in the Merit Systems Protection Board ("the Board"). On June 12, 1981, the Board affirmed the Navy's dismissal in all respects, finding that "removal for these charges serves to promote the efficiency of the service."

On July 17, 1981, Abrams petitioned the Board for review of its June 12 order. The Board granted that petition on July 21, noting that on June 8—four days before its June 12 order—the Board rendered a decision in *Merritt v. Department of Justice*, 6 MSPB 493 (1981), requiring a "nexus" be-

tween discharge for misconduct committed while off-duty and the "efficiency of the service." The Board proceeded to hold that the Navy had *not* shown a "nexus" between Abrams' discharge for the October 14 shooting and the efficiency of the service. "Accordingly," the Board concluded, "the third charge of the removal action based on [Abrams'] criminal conviction for off-duty misconduct may not be sustained for want of the requisite nexus to support such a charge."

Nevertheless, the Board concluded, Abrams' discharge could be supported by the Navy's charge of "excessive unauthorized absence" from July 28 to October 1, 1980. The Board so concluded despite the circumstance that the cause of Abrams' absence was his conviction—a circumstance for which the Board had just held Abrams could *not* be discharged. Further, the Board so held, despite Abrams' offer to continue employment, and the Navy's refusal to accept his employment, as part of the prison's work-release program.

## II.

The only question presented for our review by this petition is whether the Navy may rely on its fourth ground for terminating Abrams' employment—Abrams' absence caused by his incarceration—when it may not rely on its third ground for removing him—Abrams' conviction resulting in his incarceration—particularly when the Navy itself declined to permit Abrams to return to work in lieu of his incarceration. The question whether the Navy may rely on Abrams' conviction itself was neither briefed nor argued on appeal. Indeed, the Navy's brief states expressly that "[s]ince the [Navy] did not appeal, the Board's finding [of "no nexus"] is not at issue." Br. at 8.[1] Nevertheless, despite the Navy's failure

1. Abrams appeals from the determination that his employment could be terminated because he was absent from work when that absence was caused by his incarceration, even though the Board found that the incarceration alone was not ground for Abrams' dismissal. That question is the only issue presented on appeal.

The Navy did not cross-appeal, although it could have filed a cross-appeal stating that if Abrams were to prevail on his appeal, then the Navy would seek to have the Board reversed on the ground that the Board's "nexus" determination was erroneous in that the mere conviction itself provided sufficient "nexus" to warrant discharge. Because the Navy did not cross-ap-

to appeal this finding, and without the benefit of briefing or argument, the majority finds that the Board improperly concluded that Abrams could not be dismissed by reason of his conviction. Because the Navy did not appeal the finding of "no nexus," it is not now before us. I therefore find it remarkable that Abrams' petition should be resolved on this ground.

### A.

Even if the Navy had appealed the Board's finding that the "third charge of the removal action based on [Abrams'] criminal conviction for off-duty misconduct may not be sustained for want of the requisite nexus to support such a charge," I conclude that the record amply supports the Board's decision without the necessity of a remand.

As the majority notes, the Navy may take action against an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a) (Supp. V 1981). In *Merritt v. Dept. of Justice*, 6 MSPB 493 (1981), the Board held that a "nexus" must be established between an employee's off-duty conduct and either the employee's ability to accomplish his or her duties satisfactorily, or some other legitimate governmental interest promoting the "efficiency of the service." *Id.* at 501, citing *Doe v. Hampton*, 566 F.2d 265, 272

(D.C.Cir.1977). In order to establish a "nexus," the agency must come forward with "evidence linking the employee's off-duty misconduct with the efficiency of the service." *Id.* at 509. In "certain egregious circumstances," however, *Merritt* held that the Navy may rely on "a presumption of nexus which may arise from the nature and gravity of the misconduct." In these cases, "the presumption may be overcome by evidence showing an absence of adverse effect on service efficiency." *Id.*[2]

The majority concludes that the Board improperly found that Abrams overcame the presumption of "nexus." The Board erred, the majority holds, because it failed to consider whether Abrams showed that his conviction did not interfere with (1) the agency's overall achievement of its goals and responsibilities, and (2) its other employees' performance of their jobs. Maj. op., at 1224.[3]

Only the second of these two considerations is significant here. The first factor—whether Abrams introduced evidence that his conviction did not interfere with the Navy's "goals and responsibilities"—is amply supported by the record. As the majority concedes, Maj. op., at 1226 n. 14, Abrams never served as a spokesman for the Navy on any official policy matter nor, indeed, ever came into contact with the public at

peal, the sole issue presented on appeal is the narrow argument which Abrams has made and which the majority has not addressed.

2. The courts of appeals do not uniformly agree that *Merritt's* presumption of "nexus" is consistent with the intent of Congress. *See D.E. v. Department of the Navy*, 707 F.2d 1049 (9th Cir.1983); *Bonet v. United States Postal Service*, 661 F.2d 1071, 1078 (5th Cir.1981). In *D.E., supra,* the Ninth Circuit held, in circumstances analogous to these, that no presumption of nexus arises from a Navy employee's plea to a charge of child molestation. Rather, the Navy has the burden to show that the employee's off-duty conduct actually affects the employee's or the Navy's overall performance adversely. The Ninth Circuit thereupon rejected the Board's *Merritt* presumption, concluding that Congress intended to place the full burden of proof on the Navy.

While I find the Ninth Circuit opinion persuasive insofar as it places the burden of proof

on the agency without benefit of presumption, I need not address that issue here. Under *Merritt*—and it may be argued that we should defer to the Board's interpretation of its statutory authority, *see Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965)—it is clear that Abrams has met the standard for rebutting the presumption which the Board itself has established.

3. The majority also suggests that the Board must consider whether Abrams' conviction adversely "affected his ability to paint Navy ships." Maj. op., at 1225 & n. 12. The Board, however, already expressly considered this factor. Indeed, the Board found that the Navy "conceded in its closing brief ... that [Abrams'] criminal misconduct had no adverse impact on his ability to perform his duties as a Painter." *Abrams v. Dept. of the Navy*, MSPB Docket No. PHO7528110312, slip op. at 4–5 (July 20, 1982).

all. Because it is conceded that Abrams' conviction had nothing to do with his ability to paint, it can hardly be contended that Abrams' off-duty actions and conviction interfered with the Navy's "goals and responsibilities."

The second consideration—whether Abrams established that his conviction did not interfere with job performance by other employees—involves the question of *which party* must introduce evidence of the attitudes of co-employees toward Abrams. The Board found that the Navy "did not present any testimony by [Abrams'] co-workers," and discounted speculation by two of Abrams' supervisors, John Stull and Thomas Hare, that they were "apprehensive for the safety of their employees." *Abrams v. Dept. of the Navy*, MSPB Docket No. PHO7528110312, slip op. at 5 (July 20, 1982). According to the majority, however, Abrams, and not the Navy, must present the testimony of co-workers that his co-workers did *not* fear for their safety. The majority so finds even though Abrams himself testified that his co-workers were "glad to see [him] back," and even though the Navy purported to rebut this testimony with nothing more than the speculations of two supervisors—evidence rejected by the Board.

Our standard of review is provided in 5 U.S.C. § 7703(c) (Supp. V 1981), which requires that this court hold unlawful agency action found to be arbitrary, capricious, or an abuse of discretion, procedurally defective, or unsupported by substantial evidence. *See D.E. v. Department of the Navy*, 707 F.2d 1049, 1050 (9th Cir.1983). No claim is made that the Board acted arbitrarily or capriciously in making its findings. Further, there is undoubtedly substantial evidence to support the Board's finding that Abrams' conviction will not adversely affect his co-employees' performance of their jobs: Abrams so testified, and the Navy did not refute that testimony.

If we were to follow the Ninth Circuit's analysis—which rejects the Board's presumption of "nexus," *see* note 2 *supra*—the Navy would have to prove adverse effect

without the benefit of any presumption. However, even if we adopt the Board's *Merritt* presumption, Abrams undertook and achieved the task of rebutting that presumption to the satisfaction of the Board. The Navy's attempt to dilute or contradict Abrams' testimony with the speculations of two supervisors was not credited by the Board, and we have no basis for questioning this finding of fact. In these circumstances, a remand for further factfinding is unwarranted, unnecessary, and unauthorized, to the extent that substantial evidence exists for the Board's findings. *See* 5 U.S.C. § 7703(c)(3) (Supp. V 1981).

### B.

Before turning to the only issue presented to us on appeal, it is appropriate to address momentarily the basis for the majority opinion, which depends almost wholly on *Gueory v. Hampton*, 510 F.2d 1222 (D.C. Cir.1974), and on regulations adopted in 1975. *See* 5 C.F.R. § 731.202 (1983). Both *Gueory* and these regulations preceded the Board's own "nexus" decision in *Merritt*. Indeed, *Merritt* carefully considered *Gueory* and adopted the *Gueory* theory as to a presumption of nexus. *Gueory* expressly held, and the Board properly observed, that the presumption of "nexus" is not "irrebuttable." *Gueory, supra*, 510 F.2d at 1227; see *Merritt, supra*, 6 MSPB at 501. Accordingly, the Board held that a presumption of nexus could be overcome by evidence showing an absence of adverse effect on service efficiency, "in which case the agency [here the Navy] may no longer rely solely on the presumption but must present evidence of carrying its burden of proving nexus." 6 MSPB at 509.

It was precisely this analysis which the Board in this case utilized when it applied *Merritt*—an analysis and conclusion from which no appeal was ever taken by the Navy. *See* note 1 *supra*. The majority's reliance on *Gueory* cannot help us in reviewing whether the Board properly found "no nexus"; all *Gueory* holds is that there is a presumption of "nexus." *Gueory* does

not instruct us as to what is needed to overcome that presumption. Thus, I find it particularly inappropriate for the majority to hark back to *Gueory* as a basis for directing a remand in this case, thereby ignoring *Merritt* and those authorities which find that even *Merritt* has negated the intent of Congress by permitting a presumption of "nexus." *See D.E. v. Department of the Navy, supra;* note 2 *supra.*

### III.

I therefore turn to the issue that was in fact presented for our review, and which the parties argued and briefed on this petition: whether the Navy could dismiss Abrams for his absence during his incarceration when it could not dismiss him for the conviction leading to his incarceration, particularly when it refused to permit Abrams to return to work on a work-release program in lieu of his incarceration. I conclude that in such circumstances, the Navy could not dismiss Abrams.

I can think of nothing more arbitrary and capricious than the Navy's actions in claiming that Abrams was absent without authorization (AWOL) when it was advised by the Philadelphia Court of Common Pleas that Abrams could return to work under a work-release program. Plainly Abrams was ready and able to work, and was absent only because the Navy forced him to be so. While the Navy has ample discretion to deny permission for an employee to engage in a work-release program, once having so denied permission, it would be arbitrary and capricious for the Navy then to complain that its employee was absent without leave.[4]

Because I am satisfied that the Common Pleas Court, by making Abrams available to the Navy by its work-release program, overcame any obstacle to Abrams' continued employment by the Navy, I need not reach the question whether, even in the absence of any work-release program, the Navy would be able to rely on an absence due to incarceration as a ground for discharge when it could not rely on the underlying conviction leading to incarceration. The Seventh Circuit, rejecting the Navy's argument in such a situation, stated in *Young v. Hampton,* 568 F.2d 1253 (7th Cir.1977):

> This obvious point not only smacks of "bootstrapping," but it also ignores the real issue, which is whether the activities of which Young was convicted affected the efficiency of the service. If we were to accept the defendant's argument on this point, we would be accepting a procedure whereby an agency could *suspend* an employee for a relatively minor offense and then *dismiss* that same employee because his absence from work affected the "efficiency of the service." This double punishment for the same "crime" clearly renders such a procedure unacceptable.

*Id.* at 1260. As indicated, I need not resolve that issue here. Thus, the distinctions between *Young* and this case urged by the Navy and the Board are not relevant.[5] It is

---

**4.** Further, an argument could well be made under these circumstances, where the Navy itself was responsible for Abrams' absence, that the Navy would thereafter be estopped to charge Abrams with that very absence as a ground for terminating his employment. *See Community Health Services v. Califano,* 698 F.2d 615 (3d Cir.1983) (government estoppel generally).

**5.** In the view of the Board and the Navy, the agency in *Young* did not allege, as the ground for discharge, the employee's absence. Rather, the agency sought to use the absence to establish a nexus between Young's *conviction* and the efficiency of the service. In this view, the government's mistake in *Young* was to allege a nexus between the wrong things: rather than alleging a nexus between *conviction* and effi-

ciency, the government should have alleged a nexus between *absence* and efficiency. As for the latter, the Navy asserts, there *is* a nexus between absence and the efficiency of the service, citing Board authority for this proposition. *See Belton v. Department of the Navy,* MSPB Docket No. ATO7528090171 (April 15, 1982) (App. at 1); *Pearson v. Department of the Navy, supra; McDuffie v. Department of the Air Force,* MSPB Docket No. ATO75209028 (May 22, 1982) (App. at 26). *Belton, Pearson,* and *McDuffie* all permit absence due to incarceration to be a basis for discharge. *See also Chiaverini v. United States,* 157 Ct.Cl. 371 (1962); *Rubin v. United States,* 150 Ct.Cl. 28 (1960); *Chiriaco v. United States,* 235 F.Supp. 850 (N.D.Ala.1963), *aff'd,* 339 F.2d 588 (5th Cir.1964) (AWOL an appropriate basis for removal).

enough that under the circumstances here, the Navy's action in dismissing Abrams was inexcusable.

## IV.

Because we ultimately must meet the issue of what sanctions, if any, may be imposed upon Abrams by the Navy, it seems appropriate for me to address that subject even though the majority has failed to do so.

It does not follow that the Navy may not discipline Abrams at all. The Navy's rules regarding infractions by reason of absence provide that two successive absences shall be punished by a five-to-ten day suspension. See Record on Appeal, vol. I, at 117. In accordance with these rules, the Navy proposed, on the basis of Abrams' May 21 and June 1 absences, to impose a ten-day suspension. It would appear to me, therefore, that the maximum penalty the Navy could impose for Abrams' infraction is a ten-day suspension.

The Navy argues, however, Br. at 24, that Abrams' June 1 absence constitutes a "third offense,"[6] and further that this third offense "amounts to an unexcused or unauthorized absence on one or more scheduled days of work." Under Navy rules, such a third offense could be a ground for discharge.

This "third offense" argument was never argued or presented to the Board below, and is not before us on appeal. Moreover, this interpretation is contrary to the Navy's own recommendation, attested to during Abrams' hearing, that Abrams receive a ten-day suspension. By implication, the Navy decided at that time that Abrams' June 1 absence was a second offense, not a third offense. It does not seem unreasonable to hold the Navy to the same interpretation at this juncture.

Our standard for review of punishment for violations of personnel regulations is that of abuse of discretion. See Francisco v. Campbell, 625 F.2d 266, 269 (9th Cir. 1980); Phillips v. Bergland, 586 F.2d 1007, 1012 & n. 14 (4th Cir.1978). Because the Navy had previously determined that the appropriate sanction for Abrams' conduct would be no more than a ten-day suspension, in my opinion it would be an abuse of discretion to impose a sanction of discharge in these circumstances.

## V.

The issues as they have proliferated in this appeal have required discussion of (1) the Navy's failure to cross-appeal; (2) the focus of the majority opinion on the Board's finding of "no nexus," an issue that was not appealed; (3) the majority's attraction to Gueory v. Hampton, supra, which exalts the presumption of nexus beyond the Board's own interpretation of its statutory authority; and finally, (4) the legality of the Navy's discharge of Abrams for his absence due to incarceration, the question actually presented on appeal.

I note here that the AWOL cases cited above are inapposite: in those cases, the employee's absence is the product of his own choice, and it plainly promotes the efficiency of the service to discharge employees who frequently choose to be absent. Further, Young itself did not turn on the form of the government's pleading. The theory of Young is that a discharge for absence ought to have, as its basis, that the employee's absence indicates a character fault which impairs the efficiency of the agency. An absence due to incarceration does not do so—unless the employee's conviction itself could support a discharge.

Moreover, as the record here discloses, and as I have emphasized, Abrams offered to participate in a work-release program. In none of the foregoing cases was the absent employee afforded entry into a work-release program which, if accepted by the agency, would have obviated any absence.

6. According to the Navy's theory—a theory neither presented to nor ruled upon by the Board—Abrams was charged with a first offense on August 24, 1979, for the failure to report to work on August 3. Abrams was charged with a second offense on April 8, 1980, for several other lapses in attendance. Br. at 25. The May 21, 1980 charge—which heretofore the Navy considered one of the offenses justifying Abrams' discharge—would not be counted as an "offense" under this theory, since it related to an unauthorized telephone call rather than an absence.

Reasoning that the question of "nexus" has never been appealed and is not before us, and concluding that the Board's findings on "nexus" are ample and conclusively establish the absence of a "nexus" without the necessity of a remand, I cannot agree with the majority's judgment that a remand should be ordered. Moreover, in my opinion the Navy acted arbitrarily and capriciously in rejecting Abrams for the work-release program and then charging him with being absent without leave. These reasons have led me respectfully to dissent from the majority opinion's judgment.