861 F.2d 728
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Howard L. CASE, Petitioner,
v.
DEPARTMENT OF the ARMY, Respondent.
 No. 88-3003.
 United States Court of Appeals, Federal Circuit.
 Sept. 8, 1988.
 
 Before MARKEY, Chief Judge, NICHOLS, Senior Circuit Judge, and EDWARD D. RE, Chief Judge.*
 PER CURIAM.
 
 DECISION
 
 1
 The decision of the Merit Systems Protection Board (board), Docket No. SL07528610433, sustaining Department of the Army's (agency's) removal of Howard L. Case (Case) for notorious public conduct endangering the safety of persons, is affirmed.
 
 OPINION
 
 2
 Case cites no authority to support his argument that his misconduct was insufficiently egregious to warrant presumption of nexus. He ignores that he admitted committing the charged misconduct and was convicted for wanton endangerment and terroristic threatening as a result of that misconduct. We agree with the board that Case's asserted "excuses" of diminished capacity and police provocation are not defenses to the charges. In sum, Case has shown no error in the board's finding that Case's "criminal misconduct was so egregious that there is a rebuttable presumption of nexus." See Sanders v. United States Postal Service, 801 F.2d 1328, 1332 (Fed.Cir.1986) ("egregious criminal conduct justifies a presumption that the required nexus has been met, even when the ... offenses have occurred off duty").
 
 
 3
 Case's argument that his "evidence was sufficient to rebut at [sic] presumption of nexus" fails to recognize that "[i]t is not our duty to find nexus [or to find that the presumed nexus was successfully rebutted] but rather to decide, under our statutory scope of review in 5 U.S.C. Sec. 7703(c), whether the MSPB affirmance of the agency conclusion on the nexus issue meets the statutory criteria for our affirmance." Hayes v. Department of the Navy, 727 F.2d 1535, 1539 (Fed.Cir.1984).
 
 
 4
 The record reveals, and Case does not otherwise show, that substantial evidence supports the agency's finding that Case had not successfully rebutted the presumption of nexus. That two co-workers testified they had no fear of working with Case, though relevant to whether Case's misconduct would interfere with the performance of his co-employees jobs, is irrelevant to whether Case's misconduct adversely affected the overall achievement of the agency's goals and responsibilities. See Abrams v. United States Dept. of the Navy, 714 F.2d 1219, 1224-26 (3d Cir.1983). It is similarly irrelevant that Case's jailer testified that Case was a model prisoner. As recognized by White v. Postal Service, 768 F.2d 334, 336 (Fed.Cir.1985), extensive publicity surrounding the misconduct of a federal employee can have severe repercussions on the mission of the agency. See also Wild v. Housing & Urban Dev., 692 F.2d 1129, 1133 (7th Cir.1982) (discharge of HUD appraiser moonlighting as slum lord following extensive publicity).
 
 
 5
 Contrary to Case's argument on appeal, the agency submitted documentary evidence and testimony linking Case's misconduct to critical publicity affecting the agency's mission. That nexus was not rebutted by Case's argument that "even if his job title was Explosives Operator, he had not handled ammunition for some time...." Case had unrestricted access to such ammunition, and the board recognized that Case may be required to handle such ammunition again in the future because Case's position required the handling of explosives.
 
 
 6
 Case asserts that factors mitigating the severity of his actions were not given proper weight. "It is well established [,however,] that the determination of the proper disciplinary action to be taken to promote the efficiency of the service is a matter peculiarly and necessarily within the discretion of the agency." Parker v. United States Postal Service, 819 F.2d 1113, 1116 (Fed.Cir.1987) (and cases cited). Case has not shown that the penalty of removal, though severe, "exceeds the range of permissable punishment," id., or "is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." Id. Accordingly, the agency's choice of penalty is affirmed.
 
 
 7
 NICHOLS, Senior Circuit Judge, dissenting.
 
 
 8
 Respectfully I must dissent, because in my view Case's best defense has been inadequately considered. The proceeding should be remanded for further testimony and findings.
 
 
 9
 The administrative judge (AJ) accepts, as on the record he must, that Case's unique, bizarre, and dangerous behavior was caused by his mistakenly mixing Valium and alcohol. That error sometimes produces an anomalous reaction, opposite to the usual. Case, troubled by insomnia, telephoned his physician but reached a nurse who said the doctor would call Case's druggist with a prescription for Valium, commonly known as a "tranquilizer." Case had no previous experience with Valium. He received from the druggist a bottle containing 10 Valium pills and labeled "take as directed." He had received no directions and had no knowledge what was a proper dose. He kept the Valium untouched for two days until he needed it; then took two tablets, "around four, I believe it was * * *. Well, I went and I got into bed. I thought maybe, you know, I could get a little rest. And I laid there about an hour. I guess it was around five o'clock and I had never taken them before, and I thought maybe they aren't any good or anything, so I got up and I got dressed again and I went out." He had a beer, went home again, had another Valium, and went out again. He had more beer until disoriented, and then the bizarre events began. He could not find his car, went home without it, and called the police to report the loss. Two policemen came to his home. They found him obviously intoxicated. They first talked to him outside his house, but on one of them making a threatening, but probably jovial remark, Case bolted inside, slammed the door, and started firing through it. Police reserves rallied to the location and, of course, in the vernacular, it really hit the fan. After they got Case in custody they searched his place and found the bottle: three tablets were gone, and the label was as stated.
 
 
 10
 The AJ concluded that Case was "negligent," but purporting to apply the time-honored legal test of negligence, he finds:
 
 
 11
 I find that a reasonable person would have consulted with his physician or pharmacist before mixing drugs and alcohol or perhaps not have mixed them at all.
 
 
 12
 In a footnote he supports the argument with a statement the label contained a clear warning about the danger of alcohol consumption in conjunction with taking the medication. Yet, given the lapse of time, one could not find Case knew he was mixing. No one had told him what to expect. We do not have the exact text of this warning, and the bottle is lost. It said alcohol would "intensify" the effect of the Valium, whatever that means. It might mean: be even more sleep inducing than Valium alone.
 
 
 13
 Whatever weight he should have given the label as it was, it would not have meant so much as a clear statement the label should have had, as to what was the proper dose and what interval should elapse between one dose and another. The druggist said he had not been told the doctor's instructions and assumed they had been given directly to Case. I do not remember in a long life ever receiving any prescribed pain-killing or sleep-inducing drug that did not come behind a label giving this essential information. I take judicial notice it is a usual necessary precaution. The doctor, nurse, or pharmacist responsible for Case getting Valium without his having this information must, in my view, bear the responsibility for the strange and potentially lethal events that followed. They knew a lot more about Valium and its danger than Case did. They neglected a clear-cut duty of reasonable care. I see him as a victim of their carelessness. This is more true as Valium is very deceptive. One takes the prescribed dose and nothing happens for an hour or two. One thinks the dosage has entirely failed of it purpose (just as Case says he thought before going out for beer). Then one who has known enough to be patient a little longer, wakes up from hours of refreshing slumber prepared to face a new day. Case did not ask for Valium, it was volunteered to him.
 
 
 14
 Giving the utmost weight to the AJ's opportunity to see and hear the witnesses, I do not think his findings and conclusions, in imputing relevant negligence to Case, are supported by substantial evidence. If Case was negligent at all, he was negligent with respect to the possibility of harm to himself. It is grotesque to think he should have foreseen the possible damage from his notoriety to his agency, the Army, which is the gravamen of the one charge against him. Thus his negligence, to the extent it could rationally be found, does not refute his defense to the actual charges.
 
 
 15
 The actual charge on which Case was removed was--"notorious public conduct endangering the safety of persons." Case's real crime in the Army's eyes was that, still in a frenzy from Valium and alcohol, and under siege by police in his home, as he supposed, he telephoned a local TV station to arrange his own surrender to a newscaster. Naturally the media had a lovely story and that in a small town where bizarre happenings are rare. The base already had poor community relations and bad publicity as a result of previous incidents, newspaper accounts of which, and comment thereon, are in the present record. The public had come to believe the base was staffed with ham-handed clowns, not to be trusted with the explosives which were the reason for the base's existence. Case's incident made a bad situation worse; he was seen as a representative employee. In assessment of a penalty, it is usual and proper to consider the publicity off-duty misconduct may bring down on the employing agency. Here, however, such publicity is made an element of the misconduct itself and, moreover, Case is made to pay a price for publicity given other and earlier incidents in which he played no part. Even had he done all the rest, his treatment might have been milder if he had not telephoned that TV station: he should have remembered the agency's public relations were already a basket case.
 
 
 16
 With all its resentment, it does not appear the agency made any effort to ascertain the real cause of the Case incident. In their eyes, he was just indulging in a drunken frolic. They did try very hard to establish that he had stolen ammunition from the base and concealed it in his home, but were unable to frame any charge on that. Case was convicted at a criminal trial but on different charges. In any event, the conviction was not itself made a cause of removal, as it sometimes is. The bad publicity about Case was written by persons who did not know all the facts and who might have presented the case differently if they had.
 
 
 17
 In my view, bad publicity is properly to be considered an aggravating factor only when (a) it relates to the offense charged, not something else, and (b) fairly states the case as it is known to the MSPB when it considers the appeal. Neither condition was met here.
 
 
 
 *
 The Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation